# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| QUALITY ASSOCIATES, INC., | : | Case No. 1:18-cv-75 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| THE PROCTER AND GAMBLE DISTRIBUTING, LLC, *et al.*, | : | |
| Defendants. | : | |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (Doc. 12)**

This case is before the Court on Defendants' motion to dismiss (Doc. 12) as well as the parties' responsive memoranda (Docs. 15, 16).

## I. INTRODUCTION

### A. Parties.

Plaintiff Quality Associates, Inc. ("QAI") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. (Doc. 1 at ¶ 11).

Defendant The Procter and Gamble Distributing, LLC ("P&G") is a Delaware corporation with its principal place of business in Cincinnati, Ohio. (Doc. 1 at ¶ 6).

Defendant Yannis Skoufalos is and was at all times relevant to the Complaint the Chief Product Officer of P&G, having final decision making over all contracts and dealings with suppliers. (Doc. 1 at ¶ 7).

Defendant Patrick Paolino is and at all relevant times was an Associate Director of Purchasing at P&G. (Doc. 1 at ¶ 8).

Defendant Elizabeth Radke was at all relevant times a Scaled Operations Director for North America at P&G.  (Doc. 1 at ¶ 9).

Defendant Michelle Eggers was at all relevant times a Director of Global Purchasing at P&G.  (Doc. 1 at ¶ 10).

**B.     Facts <u>as alleged</u> by Plaintiff.**

1.     *Background*.

Witnessing the growing demand for outsourced contract packaging, Dolores Epps, an African American woman, founded QAI in Cincinnati in 1987.  (Doc. 1 at ¶ 13).  That same year, QAI was certified as a minority business enterprise.  (*Id.*)  QAI remains headquartered in Cincinnati, Ohio.  (*Id.*)  QAI is a logistics provider engaged in contract manufacture and delivery of point-of-service and point-of-sale displays for use in retail sale of consumer goods.  (*Id.*)  QAI's relationship with P&G started in or around 1987.  (*Id.*)

QAI perfected a line design and operational techniques using predominantly temporary workers over the years to become the benchmark lowest cost, highest efficiency fulfillment converter.  (Doc. 1 at ¶ 14).  QAI quickly built a reputation of delivering efficient and reliable service, as well as an established track record of developing a cost-effective turnkey solution.  (*Id.* at ¶ 15).  QAI also (a) designed new production plants, (b) engineered efficient assembly line concepts and options, (c) pioneered the use of skilled temporary workers in a safe and effective environment, and (d) facilitated many new product startups/rollouts.  (*Id.* at ¶ 16).  Given its consistent,

reliable, and seamless fulfillment experience, P&G quickly treated QAI as a direct extension of P&G and continuously used QAI's services from 1987 to 2016. (*Id.*)

In 2012, P&G announced plans to cut $10 billion in costs by 2016, with an estimated $6 billion coming from its supply chain. (Doc. 1 at ¶ 18). Concurrently, P&G launched a global initiative known as CRN (Customer Response Network) that was supposed to improve forecasting of consumer demand and minimize stock-outs at major retailers. (*Id.* at ¶ 19). Because of its reliability and track record of delivering quality services in a cost-effective model, QAI was declared the #1 supplier globally and awarded approximately 60% of the fulfillment business on a 4-year contract. (*Id.*)

      2.    *The Purchase Agreement*.

P&G and QAI entered into a Purchase Agreement with an effective date of June 1, 2014 ("Purchase Agreement") under which P&G, as "Buyer," was entitled to request certain goods and services from QAI, as "Seller." (Doc. 1 at ¶ 21).[1] The Purchase Agreement required that QAI systematically startup four new plants across the U.S., while phasing out and shutting down four legacy plants. (*Id.*).

In 2015, the P&G design team that initially worked with QAI in connection with the Purchase Agreement was phased out and a new team was brought in. (Doc. 1 at ¶ 22). The new team included Mr. Paolino, Ms. Radke, and Ms. Eggers, under the ultimate direction of Mr. Skoufalos. (*Id.* at ¶ 23). QAI claims it encountered problems with this new team due to their lack of knowledge of QAI's original bid underlying the

---

[1] The Purchase Agreement is filed at Doc. 1-1, PID # 25.

Purchase Agreement, as well as the team's lack of any operational experience in QAI's area of expertise. (*Id.* at ¶ 24).

QAI alleges it encountered issues performing under the Purchase Agreement because P&G "effectively took over the management and operations of QAI by brushing aside QAI senior management and enacting changes to policies and procedures that were detrimental to QAI's operations." (Doc. 1 at ¶ 26). These issues include, *inter alia*:

- P&G mandated QAI shrink assembly lines from 100 to 30 feet, despite QAI's protest, which negatively impacted QAI's productivity, quality control, and delivery time, and caused costs to escalate due to inefficiencies;

- P&G forced QAI to maintain extraordinary levels of co-packing materials because P&G was unable to accurately forecast demand from their retailers;

- P&G rolled out Health & Beauty, a startup outside the scope of QAI's bid for the Purchase Agreement. P&G was ill-prepared to rollout Health & Beauty and costs associated with the rollout were borne by QAI. P&G diverted profitable business away from QAI and demanded that QAI complete the start up of Health & Beauty while also implementing the roll-out of CRN; and

- P&G outsourced its global payment operations to Costa Rica. This forced QAI to adjust its treasury function to accommodate for a more convoluted and costly invoice and collections process.

(Doc. 1 at ¶¶ 26-32). QAI alleges P&G's actions—which were not foreseeable at the time QAI submitted its bid for the Purchase Agreement—resulted in additional costs and created a financial burden on QAI. (*Id.* at ¶¶ 31, 33).

### 3. *The Termination Agreement*.

In February 2016, P&G unilaterally terminated the Purchase Agreement and under duress forced QAI to enter into a Termination Agreement dated February 1, 2016. (Doc. 1 at ¶ 37; Doc. 1-1, PIN #21). P&G then began sourcing its in-store displays from non-

4

minority vendors. (*Id.* at ¶ 37).

Leading up to the termination, P&G, acting as owner of QAI, demanded QAI sell its P&G business to a non-minority competitor within three months. (Doc. 1 at ¶ 38). P&G insisted that, if the sale did not close, it would voluntarily transition QAI's business to another competitor without any remuneration to QAI. (*Id.*) Under duress, an agreement was reached to liquidate QAI. (*Id.* at ¶ 39). To preserve its minority business credits, P&G forced QAI to transition two of its sites (Georgia and Pennsylvania) to a Colorado based company owned by an African-American entrepreneur. (*Id.* at ¶ 40). QAI's remaining sites were transferred to other companies, "Pratt" and "Summit." (*Id.* at ¶ 41). Pratt and Summit used assembly lines and operating procedures designed and implemented by QAI, and were paid more than twice QAI's hourly rate for the same services. (*Id.* at ¶¶ 42-43). The transition took over nine months to complete, and QAI received modest upfront consideration for its business. (*Id*. at ¶ 41).

### C. State Court Litigation.

On January 25, 2017, P&G commenced a civil lawsuit against QAI ("State Court Litigation") in the Hamilton County Court of Common Pleas ("State Court"), Case Number A 1700465.[2] P&G's Amended Complaint alleges QAI breached the

---

[2] The Court takes judicial notice of the State Court Litigation as well as the documents on the State Court's online docket. *See Hardin v. Reliance Trust Co.*, No. 1:04-cv-2079, 2006 U.S. Dist. LEXIS 70818, * 7-8 (N.D. Ohio Sept. 29, 2006) ("This court may take judicial notice of public records and government documents, including other lawsuits, under Fed. R. Evid. 201(b).") (citations omitted); *see also Haller v. United States HUD*, No. 1:11-cv-881, 2012 U.S. Dist. LEXIS 95324, ** 5-6, n. 2 (S.D. Ohio Jul. 10, 2012) (taking judicial notice of records available on the Hamilton County Clerk of Court's online docket).

5

Termination Agreement, an "M2K Agreement," and a sublease. Under the M2K Agreement, QAI agreed to maintain the "M2K system," a system under which QAI collected and integrated all of the data and information with respect to the production of the types of goods that were the subject of the Purchase Agreement.[3]

QAI filed a counterclaim against P&G for breach of the Purchase Agreement and the Termination Agreement. Specifically, QAI's counterclaim states "[b]y failing to pay QAI for sums owed under the Termination Agreement or the underlying, surviving obligations of the Purchase Agreement . . . P&G breached one or more of its contracts with QAI."[4]

### D. This Litigation.

On February 1, 2018, roughly six months after suing P&G in the State Court Litigation for failing to pay monies owed "under the Termination Agreement or the underlying, surviving obligations of the Purchase Agreement," QAI commenced this lawsuit alleging that P&G discriminated against QAI by interfering with QAI's performance under the Purchase Agreement and by requiring QAI to execute the Termination Agreement. QAI's Complaint asserts two claims against P&G for discrimination under 42 U.S.C. § 1981, which prohibits discrimination in the making and enforcement of contracts and states, in relevant part:

> (a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be

---

[3] P&G's Amended Complaint was filed in the State Court Litigation on July 11, 2017.

[4] QAI's Counterclaim was filed in the State Court Litigation on July 25, 2017.

6

> parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b). QAI's claims are premised on its allegations that P&G discriminated against QAI because of QAI's status as a minority owned enterprise.

Specifically, Count One, titled "[d]iscrimination against QAI as to the Purchase Agreement," alleges P&G refused to allow QAI to perform under the Purchase Agreement based solely on considerations of QAI's race. (Doc. 1 at ¶¶ 85, 88). QAI claims evidence of P&G's discriminatory intent in prohibiting QAI from performing under the Purchase Agreement include, *inter alia*: altering the bid requirements after awarding the bid to QAI; interfering with QAI's business and operations, resulting in increased costs to QAI; compensating QAI less than its non-minority competitors; prohibiting QAI from using its custom assembly line and then later allowing QAI's non-minority competitors to use the very same assembly line; and forcing QAI to transfer one of its sites to a non-minority competitor. (*Id.* at ¶ 89).

Count Two, titled "[d]iscrimination against Plaintiff as to the Termination Agreement," alleges that P&G's refusal to allow QAI to perform under the Purchase Agreement, and subsequently unilaterally requesting that QAI execute the Termination Agreement, was motivated solely by considerations of race. (Doc. 1 at ¶¶ 97-98). QAI

claims evidence of P&G's discriminatory intent in forcing QAI to enter into the Termination Agreement includes, *inter alia*: P&G sourcing its in-store displays from QAI's non-minority competitors, P&G's forcing QAI to give away two of QAI's sites to a non-minority competitor, and P&G paying QAI's non-minority competitors twice the rate it paid QAI. (*Id.* at ¶ 99).

P&G filed the instant motion to dismiss, which argues QAI's claims in this lawsuit should have been brought as compulsory counterclaims in the State Court Litigation.

## II. STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id*.

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (*citing* Fed. Rule Civ. P. 8(a)(2)).

### III. ANALYSIS

P&G argues QAI's claims in this lawsuit should be dismissed because they were required to have been brought as compulsory counterclaims in the State Court Litigation. The Court agrees.

The Ohio Rules of Civil Procedure require all existing claims between litigants arising out of the same transaction or occurrence to be litigated in a single lawsuit. Ohio R. Civ. P. 13(A); *Keith A. Keisser Ins. Agency v. Nationwide Mut. Ins. Co.*, 246 F. Supp. 2d 833, 835 (N.D. Ohio 2003). "The two-pronged test for applying Civ. R. 13(A) is: (1) does the claim exist at the time of serving the pleading * * *; and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim." *Geauga Truck & Implement Co. v. Juskiewicz*, 9 Ohio St. 3d 12, 14, 457 N.E.2d 827 (1984).

Here, there is no dispute that QAI's claims in this lawsuit existed at the time QAI filed its Answer and Counterclaim in the State Court Litigation. Consequently, the sole issue at this juncture is whether QAI's claims in this case, and P&G's claims in the State Court Litigation, arise out of the same transaction or occurrence.

According to the Supreme Court of Ohio, courts utilize a "logical relation" test to determine whether claims arise out of the same transaction or occurrence:

> In determining whether claims arise out of the same transaction or occurrence, courts most frequently utilize the "logical relation" test. Under this test, "[a] compulsory counterclaim is one which 'is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts.'"
>
> . . . .
>
> Thus, multiple claims are compulsory counterclaims where they "involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties."

*Rettig Enterprises, Inc. v. Koehler*, 68 Ohio St. 3d 274, 278, 1994 Ohio 127, 626 N.E.2d 99 (1994) (citations omitted).

Here, QAI's claims in this lawsuit are "logically related" to the claims in the State Court Litigation. First, the claims involve many of the same factual issues (the commencement and dissolution of P&G and QAI's working relationship) and include overlapping legal issues (the parties' obligations under the Purchase Agreement and the Termination Agreement). P&G's allegations in the State Court Litigation that QAI breached the M2K Agreement and the Termination Agreement, and QAI's claims in this

10

Court that P&G acted unlawfully by preventing QAI from performing its obligations under the Purchase Agreement and by requiring QAI to execute the Termination Agreement, are clearly "offshoots of the same basic controversy between the parties." *Rettig Enterprises*, 68 Ohio St. at 278 (citation omitted).

Second, the claims in this case are logically related to the State Court Litigation because they will both require interpretation of the Purchase Agreement and the Termination Agreement. *See Karnofel v. Superior Waterproofing*, 11th Dist. Trumbull No. 2017-T-0026, 2017-Ohio-9346, at ¶ 22 (finding a "logical relation" between two claims because "each involve the same contract, and the same opposing party"); *Lierenz v. Bowen*, 6th Dist. Erie No. E-90-13, 1991 Ohio App. LEXIS 1160, at * 5 (March 22, 1991) ("The contract in [prior case] is the same upon which the case at bar is based. Clearly then, this latter claim arises out of the same transaction or occurrence as the claim in the first case and is, therefore, a proper subject of a compulsory counterclaim."); *Keissler Ins. Agency*, 246 F. Supp. 2d at 836. Allowing these claims to proceed in separate courts would risk inconsistent interpretations and adjudications of the parties' rights under both contracts. *Keissler Ins. Agency*, 246 F. Supp. 2d at 836 ("Whenever two courts look at the same contract, differing interpretations are possible, even if not likely.").[5]

---

[5] In the State Court Litigation, P&G and QAI accuse each other of breaching the terms of the Termination Agreement. In this case, QAI argues the Termination Agreement was signed under duress, and as a result, is void in part. (Doc. 1 at ¶ 96; Doc. 15 at 11-12). In the Court's opinion, it would inappropriately risk the potential of inconsistent judgments for this Court to consider whether the Termination Agreement (or part of it) is void at the same time the State Court is deciding whether either party breached the terms of the Termination Agreement.

Third, allowing QAI's claims in this case to proceed separately from the State Court Litigation would involve a substantial duplication of effort and time by the parties and courts. It would not be economical to litigate issues arising from the same basic set of facts—P&G's working relationship with QAI under the Purchase Agreement and the dissolution of that relationship by the Termination Agreement—in two separate trials before two different courts. Even if this Court and the State Court read the Termination Agreement and Purchase Agreement the same way, "one of them will have spent its time doing so unnecessarily." *Keissler Ins. Agency*, 246 F. Supp. 2d at 836.

QAI argues that its claims in this case are not logically related to the State Court Litigation because the State Court Litigation is a "straightforward breach of contract case" that does not involve allegations of discrimination. (Doc. 15 at 18-21). This argument is not availing. The "logical relation" test is intended to ensure that all claims from common matters are litigated in one lawsuit. *See Rettig*, 68 Ohio St. at 278. The Supreme Court of Ohio has explained the flexibility of the logical relation test:

> "'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. *** That they are not precisely identical or that the counterclaim embraces additional allegations *** does not matter. To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim.

*Id.* (citation omitted). Here, the fact that the claims in this lawsuit are not identical to the allegations in the State Court Litigation because they include "additional allegations" of

discrimination "does not matter." *Id.* QAI's claims in this case and the claims in the State Court Litigation involve "common matters" -- P&G's working relationship with QAI under the Purchase Agreement and the dissolution of that relationship by the Termination Agreement. QAI's claims are logically related to the State Court Litigation and were required to have been brought in that lawsuit. Ohio R. Civ. P. 13(A); *see Keissler Ins. Agency*, 246 F. Supp. 2d at 836 (dismissing claim in federal court that was required to have been brought as a compulsory counterclaim in a prior state court lawsuit).[6]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Doc. 12) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this case is terminated on the docket of this Court.

**IT IS SO ORDERED.**

Date: 1/28/19

Timothy S. Black
United States District Judge

---

[6] Defendants also argue QAI's claims should be dismissed because QAI waived these claims by signing the Termination Agreement. (Doc. 12 at 10-17). QAI argues the Termination Agreement was signed under duress and, as a result, the release contained therein is void. (Doc. 15 at 11-12). Having found that QAI's claims are subject to dismissal for other reasons, the Court declines to address this argument for the reasons stated in footnote 5, *supra*.